Filed 7/14/26  P. v. Rogers CA3

NOT TO BE PUBLISHED

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Butte)

| | |
|---|---|
| THE PEOPLE,<br>    Plaintiff and Respondent,<br><br>v.<br><br>LANCE PRESCOTT ERNEST ROGERS,<br>    Defendant and Appellant. | C101118, C103192<br><br>(Super. Ct. Nos. 21CF00772,<br>20CF05838 ) |

In two cases consolidated for trial, defendant Lance Rogers was convicted of continuous sexual abuse of two children and forcible oral copulation of one of the children.  The trial court sentenced him to an aggregate term of 56 years in prison.  On appeal, Rogers contends that his waiver of appointed trial counsel was invalid; that there was insufficient evidence the oral copulation was accomplished by force, duress, menace, or fear; that certain instructional errors infected the convictions for continuous sexual abuse; and that his sentence should be vacated because, in imposing the upper term for each count, the trial court erroneously relied on aggravating circumstances that had not been alleged in an accusatory pleading before Rogers waived his right to a preliminary hearing.  Finding no merit to any of these contentions, we affirm the judgment.

BACKGROUND

The cases before us stem from disclosures by two unrelated adults, J.S. and J.M., that Rogers had sexually molested them years earlier when they were children.

1

## I.

In case No. 20CF05838, involving victim J.S., the operative information charged Rogers with one count of continuous sexual abuse of a child under age 14 (Pen. Code, § 288.5, subd. (a); count one) and one count of forcible oral copulation of a victim under age 14, which was charged as a violation of section 287, subdivision (c)(2)(B) (count two).[1]  In case No. 21CF00772, involving victim J.M., the operative information charged Rogers with a single count of continuous sexual abuse of a child under age 14 (§ 288.5, subd. (a)).  In both cases, the People alleged that Rogers had suffered a prior strike conviction (§§ 667, subd. (d), 1170.12, subd. (b)), which also qualified as a prior serious felony (§ 667, subd. (a)).  The People also ultimately alleged, in both cases, various factors in aggravation set forth in rule 4.421 of the California Rules of Court.

The two cases were consolidated for trial, at which Rogers represented himself after waiving his right to counsel.  Rogers also waived his right to a jury trial on the aggravating factors.

## II.

The evidence regarding the two counts involving J.S. was as follows.  When Rogers was 18 years old, he moved in with J.S.'s family as a live-in babysitter for J.S. and his three brothers.  Rogers had met the family through J.S.'s grandmother, who ran a group home where Rogers was a resident client.  J.S.'s grandmother sometimes took Rogers and other clients, who were ages 14 to 17, on outings to her property in the mountains where they interacted with her grandchildren, including J.S.  J.S.'s grandmother would also bring Rogers and other clients to barbecues and events at J.S.'s family's house.  Eventually, Rogers and some of the other clients became close to the family, visiting almost every week.  Rogers aged out of the group home when he turned 18, and J.S.'s mother invited Rogers to live with them because he had nowhere to

---

[1]  Undesignated statutory references are to the Penal Code.

go and they considered him part of their family. The family also needed child care, and J.S.'s mother believed this arrangement would provide Rogers with a job while giving her family "an opportunity to have someone there that they loved and trusted."

Several months after Rogers moved in, he began touching J.S. inappropriately. J.S. was around eight years old at the time. The first incident occurred while J.S. was sleeping in the bedroom he shared with his brothers. That night, J.S. awoke to Rogers touching J.S.'s penis beneath his underwear. J.S. turned over to try to make Rogers stop, but Rogers continued. J.S. testified that Rogers whispered "to not make a sound and that he would hurt me if I said anything." Later in his testimony, J.S. stated that Rogers "shushed me and then told me to not tell anybody or he would hurt me." J.S. believed that Rogers could hurt him, and J.S. did not immediately report the incident to anyone. J.S. was "in shock" after the first touching and felt "intimidated and embarrassed." Similar incidents of sexual touching continued every few weeks thereafter, for at least six months.

Less than a year after Rogers moved in, J.S. and his family moved to a new house, and Rogers went with them. Rogers continued to sexually abuse J.S. throughout the year that they lived in the new house.

On certain occasions, both before and after the move, Rogers put his mouth on J.S.'s penis. J.S., who was in his late twenties when he testified, had no specific recollection of the initial oral copulation incidents. J.S. told investigators that six to 12 such incidents had occurred in the original house. The first incident of oral copulation that J.S. could specifically recall occurred in the second house. J.S. testified: "I just remember being in the bedroom and waking up to him touching me, and a few minutes later after he was touching my penis, he then went underneath the blankets and performed oral." J.S. did not do anything to try to stop Rogers, explaining, "I didn't know how to, and I was scared."

J.S. testified that he was not afraid of Rogers all the time. When they were socializing normally, Rogers would be friendly and nicer; but when engaged in sexual touching, he was "more aggressive and angry." J.S. further testified that he could only remember Rogers having explicitly threatened him during the first touching incident.

J.S. and his brothers testified that when their mother left the house, she would be gone all day and Rogers would be left to supervise them. During that time, "he would be in charge of" the boys. One of J.S.'s younger brothers testified that Rogers "always took [J.S.]" into Rogers's bedroom and locked the door for hours, just about anytime their parents left the house. During J.S.'s testimony about being alone with Rogers in Rogers's locked bedroom, the prosecutor asked: "About how often did that happen?" J.S. responded: "Two or three times that I can remember." The prosecutor then asked: "And when I say, 'How often that happened,' are you referring to inappropriate touching or oral sex?" J.S. answered: "Oral sex."

A few years later, J.S. confided in a school friend that he had been molested, but neither J.S. nor the friend disclosed Rogers's misconduct until J.S. told his grandmother in 2020 and reported it to law enforcement thereafter.

Rogers testified in his own defense and maintained that he had never sexually touched anyone in his life and had not sexually assaulted J.S. or his brothers at any time.

### III.

Many years after Rogers parted ways with J.S. and his family, he met J.M. J.M. testified as follows. J.M. recalled first meeting Rogers at a parkour practice when he (J.M.) was about 13 years old, which he estimated would have been in 2014 or 2015. When J.M. was 13, his mother suddenly left the state without him. Afterward, J.M. stayed with friends and primarily stayed at Rogers's house. There, J.M. would sleep on a couch in the living room, and Rogers would sleep on a mattress on the floor next to the couch. J.M. noticed something was wrong when he repeatedly woke up to find the button or zipper of his shorts undone. J.M. began staying awake at night and sometimes would

4

catch Rogers reaching up towards him. If J.M. moved, Rogers would dart his hand back under his own blankets. But other times, J.M. would wake up to Rogers already touching J.M.'s penis with his hand. On a couple of occasions, Rogers touched J.M. beneath his underwear, but mostly the touching consisted of Rogers making a "rubbing motion" on top of J.M.'s underwear. After the first incident, touching started happening almost every night.

J.M., who was also in his twenties when he testified, could not remember the exact timing of these molestations but stated: "I just know that for sure it was when I was 13 … ." He testified that the touching had been occurring for "maybe eight, nine months before [he] had turned 14." The touching continued when he turned 14 as well. Before J.M. turned 14, "a few months" after the touching began, he told his best friend about it. Approximately a year and a half after the first incident, J.M. confronted Rogers about the touching and asked him to stop. Rogers said that he would stop, but the touching continued. J.M. eventually moved out of the state, at approximately age 16. He disclosed the molestations to authorities a few years later, in or after 2020.

As part of Rogers's defense case, the leader of J.M.'s former parkour team testified, primarily regarding the timing of when Rogers met J.M. Consistent with J.M.'s testimony, the team leader said that he was the one to introduce Rogers to the rest of the team, including J.M. The leader met Rogers while working together at a restaurant where the leader had started working at age 16. According to the leader, he introduced Rogers to the parkour team about six months to one year after first meeting Rogers, estimating that Rogers met the team in 2016. The leader believed J.M. was "a couple years" younger than he was, so the leader believed J.M. would have been "at least almost 15" years old when they met.

Rogers testified that he met the parkour team leader in early 2016 and then met J.M. and the rest of the team in the summer of 2016. Rogers recalled the team leader being almost 17 years old and J.M. being more than 14 and a half years old when he met

the team. Rogers stated that he did not know J.M. when he was 12 or 13 years old. Rogers further testified that J.M. never resided with him, although he often came over to Rogers's house. Rogers stated that he never sexually violated J.M.

IV.

In May 2023, the jury found Rogers guilty of all three offenses. The trial court then held a bifurcated bench trial on the aggravating factors and prior conviction allegations. The court found true the prior conviction allegations and several of the aggravating factors and set the matter for sentencing.

In December 2023, the trial court granted Rogers's request to reappoint counsel. At a May 2024 hearing, the court denied Rogers's motion for a new trial (which he had filed while still representing himself) and proceeded to sentencing.

At the sentencing hearing, the trial court dismissed the prior serious felony conviction enhancements in both cases and, on its own motion, the prior strike in case No. 20CF05838. Based on four aggravating factors, the court determined that an upper term sentence was appropriate for each count. The court sentenced Rogers to an aggregate term of 60 years in prison, consisting of consecutive terms of 16 years for the continuous sexual abuse of J.S., 12 years for the forcible oral copulation conviction, and 32 years (the upper term doubled due to the prior strike) for the continuous sexual abuse of J.M.

Rogers filed a timely notice of appeal in both cases, and the appeal was docketed in this court as case No. C101118.

In July 2024, the trial court received a letter from the Department of Corrections and Rehabilitation advising that count two (forcible oral copulation of J.S.) charged a violation of section 287, subdivision (c)(2)(B), which was not in effect during the time period of the charged conduct. In response, the court modified Rogers's conviction on count two from a conviction under section 287 to one under former section 288a, subdivision (c)(2), to reflect the correct code section of the offense at the time of the

charged conduct. (See Stats. 2018, ch. 423, § 49 [renumbering § 288a to § 287, eff. Jan. 1, 2019]; § 1172.1, subd. (a)(1) [court may, at any time upon recommendation of secretary of Department of Corrections and Rehabilitation, recall previously ordered sentence and commitment and resentence defendant]; *People v. Cunningham* (2001) 25 Cal.4th 926, 1044 ["unauthorized sentence is subject to correction despite the circumstance that an appeal is pending"].)

Because the sentencing triad under former section 288a, subdivision (c)(2) was lower than the one under which Rogers had been sentenced, the trial court set the matter for resentencing. (Stats. 2002, ch. 302, § 4.) At the February 2025 resentencing, the court maintained its original sentencing decisions in all respects, except that it imposed the upper term of eight years for count two as modified, instead of the original 12 years, resulting in an aggregate term of 56 years in prison.

Rogers filed a timely notice of appeal from the resentencing in both cases, and the appeal was docketed in this court as case No. C103192. On Rogers's motion, the two appeals in case Nos. C101118 and C103192 were consolidated for briefing, oral argument, and decision.

DISCUSSION

I.

Rogers first contends that all three convictions must be reversed because the trial court violated his Sixth Amendment right to counsel by accepting his waiver of counsel under *Faretta v. California* (1975) 422 U.S. 806 (*Faretta*) without conducting a sufficient inquiry into his complaints against his appointed counsel.

A.

In late November 2020, upon the filing of the complaint involving J.S., Rogers was appointed a defense attorney. About one month later, Rogers wrote a letter to the trial court in which he requested release on his own recognizance and conveyed certain complaints about his appointed counsel. Rogers wrote that, despite leaving messages for

7

his attorney and having two court appearances, he had been "unable to talk to [the attorney] about anything." Rogers stated that he wanted to speak with his attorney about filing a motion under *People v. Superior Court (Romero)* (1996) 13 Cal.4th 497, but "no matter what I try I am unable to even talk with [counsel] at all." Rogers further stated: "I do not feel as though I have anyone defending me but [my]self and those I am blessed to have in my life as [family]." The court sent a copy of the letter to the prosecution and to defense counsel but took no other action in response.

In February 2021, the same defense attorney was appointed as counsel for Rogers in the case involving J.M. That same month, Rogers wrote a letter that he addressed to his attorney and sent to the trial court. The first three pages of the letter described Rogers's complaints about tactics being used by the District Attorney's investigators. The final page of the letter requested that his attorney take various actions. Rogers requested the filing of a *Romero* motion, stating, "I will have to file it myself if I continue to receive ineffective assistance." He also asked counsel to provide him with all discovery from the case involving J.S. and reminded counsel that he was still waiting to speak with counsel's investigator. Rogers further requested that counsel meet with him, as counsel had not visited as promised before his previous court appearance. Rogers stated, "[t]his type of nonfeasance [is] truly a deprivation of the absolute right to due process." He asked to see counsel before every court appearance, explaining: "I am asking you to operate within the scope of [d]ue [p]rocess so as to make it possible for me to exercise my rights[] that I know I am given by law in connection to [d]ue [p]rocess."

A few days later, Rogers completed a form questionnaire declaring his desire to waive his right to counsel and represent himself in both pending cases (*Faretta* waiver form).

In early March 2021, the trial court held a hearing in the case involving J.M. where it addressed Rogers's request. The court stated: "Mr. Rogers, my understanding is that you are asking the [c]ourt to relieve [defense counsel] as your attorney of record and

8

then to represent yourself in this case, which is the case before the [c]ourt; is that what you want to do?" Rogers answered: "Yes, sir." Rogers confirmed that he had completed the *Faretta* waiver form himself and responded affirmatively to the court's questions regarding whether he understood the charges and the disadvantages of self-representation. The court found that Rogers knowingly, voluntarily, and intelligently waived his right to counsel, and it relieved defense counsel as Rogers's attorney of record. At the end of the hearing, after discussing scheduling matters, Rogers informed the court that his (now former) defense counsel had not responded to his informal request for discovery. The court responded that counsel and Rogers's appointed investigator would work to get him counsel's file.

At a hearing about two weeks later, the trial court addressed Rogers's request to represent himself again, this time with respect to the case involving J.S. Rogers asked to first make a statement and informed the court that his attorney had told him he was considering a line of argument that would highlight Rogers's race. Defense counsel objected, and the court cut Rogers off. The court stated that Rogers was disclosing attorney-client communications that "don't have any bearing on what we're doing here when it comes to whether you have a right to represent yourself." Rogers replied: "Okay. Well, that's the intention on *Faretta* as well and a clear … disrespect to my due process rights." The court responded that "the relationship between you and [defense counsel] really does not have any bearing on your right to represent yourself," and Rogers replied, "Okay."

The trial court then proceeded with a more limited *Faretta* colloquy, referencing the same *Faretta* waiver form, and Rogers again confirmed that he had personally completed the form and understood his rights. The court found that Rogers knowingly and voluntarily waived his right to counsel and relieved defense counsel as Rogers's attorney in the case involving J.S.

9

B.

On appeal, Rogers argues that his *Faretta* waivers in both cases were invalid because the trial court failed to conduct an inquiry into counsel's representation under *People v. Marsden* (1970) 2 Cal.3d 118 (*Marsden*). In Rogers's view, the court could not be confident that his *Faretta* waivers were truly voluntary, where the record showed that Rogers felt compelled to represent himself because of the perceived shortcomings of his appointed counsel's representation.

The Sixth Amendment guarantees a criminal defendant both "the right to be represented by counsel at all critical stages of a criminal prosecution" and "the right to represent himself or herself." (*People v. Koontz* (2002) 27 Cal.4th 1041, 1069; see *Faretta*, *supra*, 422 U.S. at p. 819.) To exercise the right of self-representation, "a defendant must make a voluntary, knowing, and intelligent waiver of the right to counsel." (*People v. Elliott* (2012) 53 Cal.4th 535, 592.) "Courts must indulge every reasonable inference against waiver of the right to counsel." (*Koontz*, at p. 1069.)

"In order to make a valid waiver of the right to counsel, a defendant 'should be made aware of the dangers and disadvantages of self-representation, so that the record will establish that "he [or she] knows what he [or she] is doing and his [or her] choice is made with eyes open." [Citation.]' (*Faretta*, *supra*, 422 U.S. at p. 835.)" (*People v. Koontz*, *supra*, 27 Cal.4th at p. 1070.) "The requirements for a valid waiver of the right to counsel are (1) a determination that the accused is competent to waive the right, i.e., he or she has the mental capacity to understand the nature and object of the proceedings against him or her; and (2) a finding that the waiver is knowing and voluntary, i.e., the accused understands the significance and consequences of the decision and makes it without coercion." (*Id.* at pp. 1069-1070.) "We review de novo, and after a review of the entire record, the question of whether the defendant's invocation of the right to self-representation and waiver of the right to counsel was knowing and voluntary." (*People v. Best* (2020) 49 Cal.App.5th 747, 756.)

10

Under the Sixth Amendment, criminal defendants also have the right to the effective assistance of counsel. (*Strickland v. Washington* (1984) 466 U.S. 668, 686.) A criminal defendant who has been appointed counsel may seek to substitute counsel on grounds of ineffective assistance, rather than seeking to represent himself or herself. "If a defendant who asserts inadequate representation seeks to discharge appointed counsel and obtain a substitute attorney, the court must allow the defendant to explain the basis for this contention and to present specific instances of counsel's inadequate performance." (*People v. Wilson* (2023) 14 Cal.5th 839, 863-864.) This occurs through what is known as a *Marsden* hearing. For the duty to hold a *Marsden* hearing to be triggered, there must be " ' "at least some clear indication by [the] defendant," ' " either personally or through his or her current counsel, that the defendant " ' "wants a substitute attorney." ' " (*Id.* at p. 864, quoting *People v. Sanchez* (2011) 53 Cal.4th 80, 90.) "Equivocal statements of dissatisfaction do not suffice." (*Wilson*, at p. 864.)

Rogers does not challenge the sufficiency of the trial court's advisements during his *Faretta* hearings. Rather, he asserts that his letters and his statements at the second *Faretta* hearing expressing concerns about his attorney's representation should have alerted the court to the possibility that his choice to represent himself was the product of coercion, thereby triggering a duty of inquiry. Rogers has equivocated on the precise nature of the desired inquiry. His opening brief asserted that the trial court "should have held a *Marsden* inquiry before accepting [his] waiver of counsel," but at oral argument, Rogers's counsel reiterated that, as stated in his reply brief, "this is not a *Marsden* issue" but rather a more general failure to confirm that Rogers's waiver of counsel was not driven by his belief that he was not being effectively represented. We reject these contentions.

Rogers's oral and written statements to the trial court before waiving his right to counsel triggered no formal duty of inquiry under *Marsden*. At no point did he specifically request or otherwise clearly indicate that he wanted a substitute attorney in

11

place of his appointed counsel. (See *People v. Wilson*, *supra*, 14 Cal.5th at p. 864.) What Rogers requested, and all that he requested, was permission to represent himself. Our state supreme court has made clear that a request for self-representation does not trigger a duty to conduct a *Marsden* inquiry or to suggest substitution of counsel as an alternative. (E.g., *People v. Mendoza* (2000) 24 Cal.4th 130, 157 [finding no duty to hold *Marsden* hearing because the defendant's expression of desire to act as his own attorney was not clear indication he wanted substitute counsel]; *People v. Burton* (1989) 48 Cal.3d 843, 855.) *Faretta* motions and *Marsden* motions "are fundamentally different, one raising the question of defendant's competency to waive his right to counsel, and the other raising the question of existing counsel's competency." (*Burton*, at p. 855.)

Furthermore, even when a request for self-representation is accompanied by complaints about current counsel, no duty to conduct a *Marsden* inquiry arises absent a request for a substitute attorney. (*People v. Burton*, *supra*, 48 Cal.3d at p. 855 ["Nor is it the rule that whenever a defendant makes a motion to represent himself on the basis of dissatisfaction with counsel, the court automatically should inquire whether he would like to make a motion for substitution of counsel"].) That is the scenario here. After expressing frustrations with various aspects of appointed counsel's representation, Rogers informed the trial court that he wished to represent himself but did not suggest a desire for substitute counsel. Rogers highlights that, at the second of the two hearings, he stated that his dissatisfaction with counsel was "the intention on *Faretta*," but, as we have explained, a trial court's duty to hold a *Marsden* hearing is not triggered where the defendant asserts inadequate representation by counsel only to explain why he or she is choosing self-representation. We decline Rogers's invitation to import a duty of inquiry under *Faretta* where none was required under *Marsden*.

The Court of Appeal's decision in *People v. Gonzalez* (2012) 210 Cal.App.4th 724 further supports our conclusion. There, the court rejected a claim that a *Faretta* waiver was ineffective for failure to conduct a *Marsden* hearing after the defendant had

12

complained about his appointed counsel's conduct and requested to " 'go pro per … .' " (*Id.* at p. 738; see *id.* at pp. 739-742.)  The court reasoned that the defendant's written submission conveyed a desire to represent himself without requesting a different appointed attorney, and at the ensuing hearing he responded affirmatively when the trial court asked whether he wanted to represent himself.  (*Id.* at p. 741.)  The same is true of Rogers's actions here.  Rogers seeks to distinguish *Gonzalez* on the ground that, unlike here, the defendant had already had two *Marsden* hearings and had made a remark at the hearing that suggested any desire for counsel was secondary to his desire to represent himself.  (*Id.* at pp. 739, 741.)  But we find the unequivocal nature of the self-representation request and the absence of a request for substitution more central to the court's holding there.  (*Id.* at pp. 740-741.)

Citing two older Court of Appeal cases, Rogers argues that some form of inquiry was nonetheless required to ensure that his election of self-representation was voluntary.  We are not persuaded.  In *People v. Cruz* (1978) 83 Cal.App.3d 308, the Court of Appeal found that, despite having "clearly satisfied the requirements of *Marsden*," the trial court "should have inquired further into the particulars of [the] defendant's claim" of a conflict of interest with the entire public defender's office, including his present appointed deputy defender.  (*Id.* at p. 317; see *id.* at p. 316.)  *Cruz* held that the trial court's "failure to fully explore [the] defendant's charges," made in connection with his motion to represent himself, "precluded the possibility of a substitution of counsel," leaving the defendant with the belief "that he could not expect effective representation from the public defender's office."  (*Id.* at p. 318.)  As a result, the court concluded, the "defendant [could not] be said to have been fully apprised of his right to counsel and therefore did not effectively waive that right."  (*Ibid.*)

We are not persuaded that the trial court's lack of inquiry here resulted in a similar misimpression.  At most, Rogers had seen the trial court take no action on his written reports of being unable to communicate and meet with counsel early in one of his cases;

and Rogers had heard the court say—after he had already waived counsel in one case—that his issues with counsel had no bearing on his request to represent himself. The court did not say that substitution of counsel was unavailable. We are unconvinced that this set of circumstances "precluded the possibility of a substitution of counsel" or left Rogers under the impression that he lacked any "viable alternative[]" to self-representation. (*People v. Cruz*, *supra*, 83 Cal.App.3d at p. 318.)

Rogers's reliance on *People v. Hill* (1983) 148 Cal.App.3d 744 likewise fails. Unlike the defendant in *Hill*, Rogers never stated that he did *not* wish to represent himself; nor did he express that he "was only representing himself because the court had refused to appoint counsel." (*Id.* at p. 751; see *id.* at p. 750; *People v. Bankston* (June 1, 2026, S044739) __ Cal.5th __ [2026 Cal. Lexis 3006] [p. 35, fn. 4] [distinguishing *Hill*].)

After we heard oral argument, our state supreme court issued an opinion rejecting an argument in which the defendant, like Rogers, claimed that his *Faretta* waiver was involuntary and coerced because he was misled about his right to effective assistance of counsel. (*People v. Bankston*, *supra*, __ Cal.5th at p. __ [pp. 34-36].) The supreme court's analysis there applies equally here: "[b]ecause [Rogers] consistently asserted his desire to represent himself, and never sought to replace his lawyer, there was no reason for [the trial court] to explore the topic of counsel's effectiveness and no basis for viewing [the court's] remarks as defining or limiting the nature of representation to which [Rogers] was entitled. [¶] What is more, at no time after the hearing[s] at which [Rogers]'s *Faretta* motion[s] [were] granted did [Rogers] seek to relinquish his self-representation status and have counsel reappointed" before the verdicts were rendered. (*Id.* at p. 35.)

Because the trial court had no duty to inquire into Rogers's complaints about counsel before accepting his *Faretta* waivers, we reject Rogers's Sixth Amendment claim.

## II.

Rogers next contends that insufficient evidence supports his conviction for forcible oral copulation of J.S. in violation of former section 288a, subdivision (c)(2).

" 'In reviewing a sufficiency of evidence claim, the reviewing court's role is a limited one. " 'The proper test for determining a claim of insufficiency of evidence in a criminal case is whether, on the entire record, a rational trier of fact could find the defendant guilty beyond a reasonable doubt. [Citations.] On appeal, we must view the evidence in the light most favorable to the People and must presume in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence.' " ' [Citation.] ' " 'Although we must ensure the evidence is reasonable, credible, and of solid value, nonetheless it is the exclusive province of the trial judge or jury to determine the credibility of a witness and the truth or falsity of the facts on which that determination depends.' " ' " (*People v. Alvarez* (2025) 18 Cal.5th 387, 470.)

At the time of the alleged acts of oral copulation, now former section 288a proscribed "an act of oral copulation when the act is accomplished against the victim's will by means of force, violence, duress, menace, or fear of immediate and unlawful bodily injury on the victim or another person." (Former § 288a, subd. (c)(2); Stats. 2002, ch. 302, § 4.) Rogers argues that this conviction must be modified to reflect a nonforcible version of the offense because the evidence was insufficient to prove that any act of oral copulation of J.S. was accomplished by one of the enumerated means. The People defend the conviction by arguing, as the prosecution had argued to the jury, that there was sufficient evidence of duress, menace, and fear. Because we agree that there was sufficient evidence of duress, we need not address whether other means were also supported.

" 'Duress' as used in this context means 'a direct or implied threat of force, violence, danger, hardship or retribution sufficient to coerce a reasonable person of ordinary susceptibilities to (1) perform an act which otherwise would not have been

15

performed or, (2) acquiesce in an act to which one otherwise would not have submitted.' " (*People v. Cochran* (2002) 103 Cal.App.4th 8, 13 (*Cochran*), disapproved of on another ground by *People v. Soto* (2011) 51 Cal.4th 229, quoting *People v. Pitmon* (1985) 170 Cal.App.3d 38, 50 (*Pitmon*) [defining duress under § 288, subd. (b)(1) forcible lewd conduct], disapproved on another ground in *Soto*, at p. 248, fn. 12; see *People v. Leal* (2004) 33 Cal.4th 999, 1004-1005 [noting § 288 definition of duress has also been applied to former § 288a].) "[D]uress is by nature a form of psychological coercion" (*People v. Townes* (2025) 108 Cal.App.5th 603, 613, fn. 4) and is "measured by a purely objective standard" (*Soto*, at p. 246).

In determining the existence of duress, courts consider the totality of the circumstances, including such factors as the victim's age, relationship to the perpetrator, and relative physical vulnerability, as well as the perpetrator's use of physical control in response to attempts to resist, the perpetrator's threats to harm the victim, or his warnings to the victim about revealing the molestation. (*People v. Thomas* (2017) 15 Cal.App.5th 1063, 1072; *Cochran*, *supra*, 103 Cal.App.4th at pp. 13-14; *Pitmon*, *supra*, 170 Cal.App.3d at p. 51.) The jury in this case was instructed accordingly that, in deciding whether an act of oral copulation "was accomplished by duress," it was to "consider all the circumstances, including the age of the other person and his relationship to the defendant."

Here, considering the totality of the circumstances, the jury had sufficient evidence to find that Rogers committed an act of oral copulation on J.S. by means of duress. As Rogers acknowledges, he began his series of molestations with an explicit and direct threat that he would "hurt" J.S. should he tell anyone or make any noise. J.S. could not recall Rogers having done anything to threaten him beyond making that threat, but the jury could reasonably infer that the initial threat of harm would have been sufficient to psychologically coerce an ordinary eight to 10 year old, like J.S., into submitting to subsequent sex acts, including oral copulation, to which he would not otherwise have

16

submitted, when considered alongside the surrounding circumstances. (*Pitmon*, *supra*, 170 Cal.App.3d at p. 50; *Cochran*, *supra*, 103 Cal.App.4th at p. 13 ["threat to a child of adverse consequences … if [he or] she reports or fails to acquiesce in the molestation, may constitute a threat of retribution and may be sufficient to establish duress"]; *People v. Townes*, *supra*, 108 Cal.App.5th at p. 613 [same].)

Rogers argues that his threat was insufficient because it was premised not on the failure to engage in the sexual activity but rather on the disclosure of the activity. Rogers relies on *People v. Hecker* (1990) 219 Cal.App.3d 1238, at pages 1242 and 1251, footnote 7, disapproved on another ground in *People v. Soto*, *supra*, 51 Cal.4th 229, where the court found insufficient the stepfather-defendant having "warned" the victim not to tell anyone about the molestation incidents because it would ruin his marriage and career and put him in jail. The court in *Hecker* concluded that "such testimony establishes merely the threat of hardship directed at 'later *disclosure* of the sex acts and not [the failure to perform] the sex acts themselves.' " (*Hecker*, at p. 1251, fn. 7, brackets in original.) *Hecker* is distinguishable on its facts. (See *id.* at pp. 1241, 1250 [victim age 12 or 13 was not threatened or consciously afraid of defendant harming her]; see also *People v. Veale* (2008) 160 Cal.App.4th 40, 47 [distinguishing *Hecker* on similar grounds].) But more fundamentally, "[w]e doubt that young victims of sexual molestation readily perceive this subtle distinction" between threats regarding future disclosure and threats tied to noncompliance. (*People v. Senior* (1992) 3 Cal.App.4th 765, 775 [defendant's warning to victim after first molestation "that to talk about it could result in divorce … also implied jeopardy to the family unit if she failed to submit to future molestation"].) "A simple warning to a child not to report a molestation reasonably implies the child should not otherwise protest or resist the sexual imposition."

(*Ibid.*) The same is doubly true of an express threat to harm the child for reporting an act of sexual abuse.

Turning to the surrounding circumstances, the jury could reasonably infer that Rogers was somewhere between 18 and 21 years old at the time of the oral copulations, in comparison to J.S.'s eight to 10 years of age. A roughly 10-year gap at those ages is significant. J.S. testified that he felt "intimidated," was "scared" at least during one of the oral copulation incidents, and believed Rogers could hurt him. From all of this, the jury could have reasonably inferred that J.S. was physically vulnerable to Rogers. (See *Pitmon*, *supra*, 170 Cal.App.3d at p. 51 ["The disparity in physical size between an eight-year-old and an adult also contributes to a youngster's sense of his relative physical vulnerability"].) And the jury could reasonably have viewed this vulnerability as enhanced by the fact that, at least at the second house, Rogers would isolate J.S. by taking him, alone, into Rogers's bedroom and locking the door whenever J.S.'s parents left the house. Although the trial transcript is not perfectly clear on this point, J.S.'s testimony can fairly be construed to convey that acts of oral copulation occurred on at least two or three occasions when he was locked in the bedroom with Rogers.

Further, Rogers occupied a position of trust and authority in J.S.'s life. Rogers points out that he was neither a father nor a father figure to J.S., as the perpetrator often is in cases involving duress. Still, there was substantial evidence to conclude that Rogers had a familial relationship with J.S. and held a position, as the family's live-in babysitter, that came with substantial authority over J.S. and his brothers. J.S.'s mother described how they considered Rogers part of the family and testified that she brought Rogers into the household because he was someone the family "loved and trusted." J.S. and his brothers testified that Rogers was entrusted with their supervision while their parents were out of the house. According to one of the brothers, Rogers was left "in charge of" them on those occasions. In addition, eight to 10-year-old J.S. was of "an age at which adults are commonly viewed as authority figures." (*Pitmon*, *supra*, 170 Cal.App.3d at

18

p. 51 [eight-year-old victim].)  Thus, the fact that Rogers was not a biological relative of J.S. does not preclude a finding of duress, given the substantial evidence that he took advantage of his position of authority over J.S. and his brothers to isolate J.S. and coerce him into sexual activity.  (See *People v. Superior Court (Kneip)* (1990) 219 Cal.App.3d 235, 237-238 [reversing § 995 dismissal of § 288, subd. (b) charges because duress could be shown where the victim "frequently visited the home and played with defendant's sons, and [the victim's] mother was friends with defendant and defendant's wife," creating a "long-standing relationship of trust" between the defendant and victim].)

We conclude there was substantial evidence for the jury to find that Rogers committed an act of oral copulation on J.S. by means of duress.

III.

Turning to Rogers's claims of instructional error, he first contends that his conviction for continuous sexual abuse of J.M. should be reversed because the jury was instructed that the People only had to prove that the constituent acts occurred "reasonably close" to the timeframe alleged, leaving it possible that the jury impermissibly convicted Rogers for acts occurring after J.M. turned 14 years old.

Section 288.5 provides in relevant part:  "Any person who either resides in the same home with the minor child or has recurring access to the child, who over a period of time, not less than three months in duration, engages in three or more acts of substantial sexual conduct with a child … or three or more acts of lewd or lascivious conduct, as defined in [s]ection 288, with a child under the age of 14 years at the time of the commission of the offense is guilty of the offense of continuous sexual abuse of a child … ."  (§ 288.5, subd. (a).)  A violation of section 288.5 thus requires proof that: (1) the defendant lived with or had recurring access to a child, (2) the defendant engaged in three or more acts of substantial sexual conduct or lewd or lascivious conduct with the child, (3) three or more months passed between the first and last acts, and (4) the child

19

was under age 14 at the time of the acts. (*People v. Valenti* (2016) 243 Cal.App.4th 1140, 1158.)

"In a prosecution under the statute, the trier of fact need unanimously agree only that the requisite number of specified sexual acts occurred, not which acts constituted the requisite number." (*People v. Johnson* (2002) 28 Cal.4th 240, 243, citing § 288.5, subd. (b).) In addition, "the prosecution need not prove the exact dates of the predicate sexual offenses." (*People v. Mejia* (2007) 155 Cal.App.4th 86, 97; accord, *People v. Valenti*, *supra*, 243 Cal.App.4th at p. 1158.) "Rather, it must adduce sufficient evidence to support a reasonable inference that at least three months elapsed between the first and last sexual acts." (*Mejia*, at p. 97; see *People v. Rodriguez* (2002) 28 Cal.4th 543, 550 [§ 288.5 "requires at least three acts of sexual misconduct with the child victim over at least three months"].)

Here, as Rogers acknowledges, the jury was correctly instructed on the elements of section 288.5 through CALCRIM No. 1120. That instruction specified that the People were required to prove, as the fourth element of the offense, that "[t]he child was under the age of 14 years at the time of the acts." It further explained that "a person becomes one year older as soon as the first minute of his or her birthday has begun."

The jury was also instructed with CALCRIM No. 207, which set forth the timeframes alleged for each of the counts. With respect to the charge of continuous sexual abuse of J.M., the instruction stated (consistent with the operative information) that the crime was alleged to have "occurred from on or about February 11, 2014 to on or about February 10, 2016." The latter date was the day before J.M.'s 14th birthday. The instruction then concluded: "The People are not required to prove that the crimes took place exactly on any of those days but only that they happened reasonably close to those days."

During the discussion of jury instructions, Rogers stated that he had no objection to this instruction. The People claim that Rogers thereby forfeited his current appellate

20

challenge to the instruction, but "failure to object to instructional error will not result in forfeiture if the substantial rights of the defendant are affected." (*People v. Mitchell* (2019) 7 Cal.5th 561, 579; see § 1259.) We thus review Rogers's claim to determine whether the phrasing of CALCRIM No. 207 affected his substantial rights.

Trial courts have "a duty to refrain from giving … instructions on principles of law that are irrelevant and that would have the effect of confusing the jury or relieving it from making findings on the relevant issues." (*People v. Barber* (2020) 55 Cal.App.5th 787, 799.) " 'When considering a claim of instructional error, we view the challenged instruction in the context of the instructions as a whole and the trial record to determine whether there is a reasonable likelihood the jury applied the instruction in an impermissible manner.' " (*People v. Mataele* (2022) 13 Cal.5th 372, 419 [de novo review of claims of instructional error].) We presume that jurors are capable of understanding, correlating, and applying the court's instructions. (*People v. Lewis* (2001) 26 Cal.4th 334, 390; *People v. Sanchez* (2001) 26 Cal.4th 834, 852.)

Rogers argues that, while CALCRIM No. 207 was a correct statement of law in the abstract, it was inapplicable and unnecessary in this case because none of the three charged offenses was alleged to have occurred on a particular date, but rather over a range of dates. Rogers cites no authority limiting the instruction's applicability to the former scenario. And the model instruction appears to contemplate that CALCRIM No. 207 could properly be given both in connection with crimes that are alleged to have occurred on a particular date and those alleged to have occurred over a given period of time. The model instruction includes the directive to "<*insert alleged date*(*s*) *or date ranges by count*>" in the blank space provided for specifying the date(s) of alleged occurrence. (CALCRIM No. 207, some italics omitted.)

Still, we understand Rogers's main argument to be that the instruction, even if applicable, impermissibly misled jurors to believe that they did not need to find the requisite number of abusive acts occurred while J.M. was under age 14. Because the

21

operative information alleged that the acts occurred up until the day of J.M.'s 14th birthday, Rogers argues that it was misleading to instruct them that it was sufficient if the crimes happened "reasonably close" to the date range alleged. Rogers further claims that the prosecutor exacerbated the danger of this misunderstanding by stating, in discussing the date range alleged for the continuous sexual abuse of J.M.: "The People aren't required to prove that the crimes took place exactly on those days, but just reasonably close. So even if you do believe it was a little before *or* [*a*] *little after* those date ranges, as long as it's reasonably close and you believe the other elements have been met, you can find him guilty." (Italics added.)

Even acknowledging the prosecutor's italicized misstatement, in considering the instructions and trial record as a whole, we discern no reasonable likelihood that the jury impermissibly applied the "reasonably close" language of CALCRIM No. 207 to convict Rogers based on acts occurring after J.M.'s 14th birthday. First, both the accompanying instruction in CALCRIM No. 1120 and other portions of the prosecutor's closing argument made clear that J.M. had to be *under* 14 years old when the acts of abuse occurred. The version of CALCRIM No. 1120 that the jury received advised that Rogers was charged "with Continuous Sexual Abuse of a Child *Under the Age of 14 Years* in violation of Penal Code section 288.5(a)." (Italics added.) And it stated plainly that the People were required to prove that "[t]he child was under the age of 14 years at the time of the acts," adding that "a person becomes one year older as soon as the first minute of his or her birthday has begun." The prosecutor reinforced the importance of this upper age limit when, in his rebuttal closing argument, he discussed why Rogers testified to having moved into the house where he allegedly abused J.M. years later than the prosecution's evidence showed. The prosecutor urged the jury that it was because Rogers knew that "an element of the offense … regarding [J.M.] is that he be under 14 years old when the attacks occurred. That's why he told you he didn't move there until it was 2016, once [J.M.] had become too old to be a victim of [section] 288.5." These aspects

22

of the instructions and attorney argument properly conveyed a strict age limit, in no way suggesting that J.M. could be slightly over 14 years old.

Furthermore, in explaining why Rogers was guilty of molesting J.M., the prosecutor focused the jury on the evidence that a sufficient number of acts had occurred for a sufficient duration while J.M. was under age 14. After reminding the jury of J.M.'s birth date, the prosecutor stated: "That means in 2014 he [(J.M.)] turned 12. At some point in 2014, he moved in with the defendant. And you heard him say that he was under the age of 14 when some of these incidents occurred, that it was more than three months, and it was far more than three different occasions within that three months."

Rogers argues that by stating that "some" of the incidents occurred when J.M. was under age 14, the prosecutor added to the perception of a relaxed age requirement. But, in light of the evidence, we find no reasonable likelihood that the jury relied on one or more incidents that occurred "reasonably close" to, and subsequent to, J.M.'s 14th birthday. In his testimony, J.M. provided solid evidence of Rogers touching him sexually for more than three months before his 14th birthday. J.M. recalled being 13 years old when his mother left him to find his own housing, a memorable life event. While he could not remember the exact dates of the sexual touching incidents, J.M. testified that they "for sure" occurred when he was age 13 and had been occurring for "maybe eight, nine months before [he] had turned 14." J.M. also stated that when he told his best friend about the molestation "a few months" after it began, he was not yet 14 years old. And as to frequency, J.M. said the touchings occurred almost every night. While J.M.'s testimony also indicated that the touchings continued after he turned 14, he never specifically described any individual incident either before or after that date. His testimony effectively amounted to a statement that Rogers touched him sexually on a nearly nightly basis for as many as nine months before he turned 14, as well as after that. Given this record and the instruction that the acts must have taken place when J.M. was under age 14, we see no likelihood that a juror would have mistakenly relied on one or

more acts occurring after J.M.'s 14th birthday, rather than the nearly nightly acts preceding that date.

We are not persuaded by Rogers's argument that the conflicting evidence regarding the timing of when he first met J.M. increases the likelihood that the jury relied on acts close to and postdating J.M.'s 14th birthday. The parkour team leader testified that Rogers met J.M. and the rest of the team in 2016 when J.M., he believed, would have been almost 15 years old. Rogers himself testified that he met the team in the summer of 2016 when, to his knowledge, J.M. was more than 14 and a half years old. While it is theoretically possible the jury could have believed this testimony while rejecting Rogers's outright denials of the abuse, we do not find it reasonably likely that the jury would have interpreted this testimony as establishing a window of abuse that was "reasonably close" to J.M.'s 14th birthday. Though this phrase may not admit of any precise timing parameters, a juror of reasonable intelligence would not view a gap of more than six months beyond the end of a two-year span of dates as "reasonably close to" that date range.

The phrasing of CALCRIM No. 207 did not violate Rogers's substantial rights. (§ 1259; *People v. Mataele*, *supra*, 13 Cal.5th at p. 419.)

IV.

Rogers also contends that both convictions for continuous sexual abuse must be reversed because the jury was incorrectly instructed that continuous sexual abuse (§ 288.5) is a general intent crime.

The jury received a version of CALCRIM No. 252 regarding the required union of act and intent for each charged crime and lesser included offense. That instruction categorized the crimes into those requiring "general criminal intent" and those requiring a "specific intent or mental state." It listed continuous sexual abuse of a child in the general intent category.

At trial, Rogers stated that he had no objection to CALCRIM No. 252 as written. As we have explained, however, we review claimed instructional errors alleged to have affected a defendant's substantial rights even absent an objection. (§ 1259; *People v. Mitchell*, *supra*, 7 Cal.5th at p. 579.)

A trial court is required to instruct the jury on the elements of a charged offense. (*People v. Mil* (2012) 53 Cal.4th 400, 409.) When the offense requires specific intent, the court must instruct jurors on the requisite mental state as well as the required concurrence of act and specific intent. (*People v. Saavedra* (2018) 24 Cal.App.5th 605, 614; *People v. Ngo* (2014) 225 Cal.App.4th 126, 162.)

Here, the given version of CALCRIM No. 252 erroneously identified continuous sexual abuse (§ 288.5) exclusively as a general intent crime. That crime can qualify as either an offense requiring general intent or one requiring specific intent, depending on how it is pleaded and proven. There are "three ways of proving continuous sexual abuse: by proof of 'substantial sexual conduct'; by proof of 'lewd and lascivious conduct'; or by both." (*People v. Canales* (2024) 106 Cal.App.5th 1230, 1244.) "Substantial sexual conduct refers to certain acts (penetration, oral copulation or masturbation) but does not require any kind of specific intent." (*People v. Garcia* (2014) 229 Cal.App.4th 302, 313, fn. 3, citing § 1203.066, subd. (b) & *People v. Avina* (1993) 14 Cal.App.4th 1303, 1313.) "However, to commit a lewd and lascivious act, the perpetrator must harbor the intent to arouse the sexual desires of the child or him or herself." (*Garcia*, at p. 313, fn. 3, citing § 288, subd. (a) & *People v. Cuellar* (2012) 208 Cal.App.4th 1067.) In this case, the prosecution did not specify which theory of guilt it was pursuing, either in the informations or at trial. We thus agree with Rogers that it was possible that the jury's guilty verdict rested on a theory requiring the People to prove his specific intent, and the jury instructions were thus erroneous in failing to instruct the jury on that requirement.

That error, however, was harmless under any standard. Under the more stringent standard set forth in *Chapman v. California* (1967) 386 U.S. 18, reversal is required

unless a reviewing court concludes "beyond a reasonable doubt that the jury verdict would have been the same absent the error." (*People v. Schuller* (2023) 15 Cal.5th 237, 261.) We are confident, beyond a reasonable doubt, that an instruction on section 288.5's different mental states would not have changed the guilty verdicts in either J.S. or J.M.'s case. The evidence of continuous sexual abuse of each victim consisted of numerous instances of Rogers touching the boys' penises with his hand, either over or under their underwear, while they were sleeping or appearing to sleep.[2] In J.M.'s case, the jury heard that Rogers's hand would make a "rubbing motion back and forth" during these touchings. While J.S. did not describe Rogers's precise movements, he did relate that Rogers told him not to make a sound and not to tell anyone what Rogers had done. Under these circumstances, a rational juror could only infer that Rogers's intent in touching the boys' penises was sexual. "Only one reason explains why an adult man, in secret, touches a [child's genitals] and, afterwards, … tells [him or] her not to tell [anyone], and does so repeatedly." (*People v. Canales*, *supra*, 106 Cal.App.5th at p. 1251; see *id.* at pp. 1249-1251 [finding harmless CALCRIM No. 252's categorization of § 288.5 as general intent crime].) "No other mental state fits the facts." (*Id.* at p. 1251.) Moreover, Rogers offered no "morally innocent or ambiguous explanation of his intent." (*Ibid.*) His defense was that he never inappropriately touched J.S. or J.M. at all. Thus, "[i]ssues about mental states were irrelevant." (*Ibid.*; see also *People v. Saavedra*, *supra*, 24 Cal.App.5th at p. 616 [defendant's failure to contest his intent in committing sexual penetration of a child (§ 288.7, subd. (b)) supported finding of harmlessness of instructional error].)

---

[2] Although there was also evidence of oral copulation of J.S., the prosecution informed the jury that the charge of continuous sexual abuse of J.S. covered only conduct occurring in the first house where Rogers lived with J.S.'s family—at which J.S. could not recall any particular act of oral copulation.

In sum, even if the jury considered the constituent touchings lewd and lascivious conduct, rather than substantial sexual conduct, it would have found that Rogers acted with the requisite specific intent. Thus, any error in failing to instruct the jury on the specific intent required was harmless beyond a reasonable doubt. (*People v. Schuller*, *supra*, 15 Cal.5th at p. 261.)

V.

Last, we address Rogers's contention that the trial court erred in allowing the People to amend the information in each case to newly allege certain aggravating factors, later cited in support of upper term sentences, after he had already waived his right to a preliminary hearing in both cases.

A.

The original felony complaints filed in each case against Rogers alleged no circumstances in aggravation listed in rule 4.421 of the California Rules of Court. The complaints were filed and were deemed informations upon Rogers's waiver of his right to a preliminary hearing in each case, at a time when California's sentencing scheme left it to the discretion of the trial courts whether to impose the upper, middle, or lower term. (Former § 1170, subd. (b); see Stats. 2015, ch. 378, § 2; *People v. Pantaleon* (2023) 89 Cal.App.5th 932, 935-936 [describing recent history of California's determinate sentencing law], disapproved of on other grounds by *People v. Wiley* (2025) 17 Cal.5th 1069.)

Effective January 1, 2022, the Legislature amended section 1170 in Senate Bill No. 567 (2021-2022 Reg. Sess.) (Senate Bill No. 567) to provide that a "court may impose a sentence exceeding the middle term only when there are circumstances in aggravation of the crime that justify the imposition of a term of imprisonment exceeding the middle term, and the facts underlying those circumstances have been stipulated to by the defendant, or have been found true beyond a reasonable doubt at trial by the jury or by the judge in a court trial." (§ 1170, subd. (b)(2); see Stats. 2021, ch. 731, § 1.3.)

27

In February 2022, the People filed first amended informations in both cases. Neither alleged any aggravating factors.

In May 2023, on the first day of Rogers's trial, before jury selection, the prosecution moved to amend both informations to allege six aggravating factors. In addressing the motion, the trial court confirmed with the prosecution that the only proposed change to the informations was the addition of alleged aggravating factors pursuant to the amendment to section 1170. After Rogers reviewed the second amended informations, the court asked if he had "any questions about what … the allegations [were] for." Rogers replied, "No. It's pretty clear." The court then asked whether he had any objection to the filing of the second amended informations, and Rogers responded: "No objection." The court granted leave to amend, and Rogers entered pleas of not guilty and denied all of the special allegations, including the aggravating factors.[3]

At the post-verdict bifurcated bench trial on the prior conviction allegations and aggravating factors, the trial court found true four of the alleged aggravating factors as to both cases. At both the sentencing and resentencing hearings, the court cited those four aggravating factors as the basis for its decision to impose upper term sentences for Rogers's convictions. Rogers, who was represented by counsel at both sentencing proceedings, voiced no objection to the court's reliance on these aggravating factors at either hearing.

B.

On appeal, Rogers claims that the trial court erred in relying on three " 'conduct-based' " aggravating factors because they were pleaded after he waived his right to a preliminary hearing. We do not reach the merits of his arguments because, as the People

---

[3] On the second to last day of trial, after presenting their case-in-chief, the People filed a third amended information in J.S.'s case (20CF05838) amending the date range for the continuous sexual abuse count. That operative information does not repeat the aggravating factor allegations, but Rogers does not raise this omission in his argument.

assert, Rogers forfeited this claim by failing to object below. (*People v. Leonard* (2014) 228 Cal.App.4th 465, 481 [failure to object to amendment of information forfeits argument on appeal].) Rogers acknowledges that he did not raise this issue in the trial court but urges that we should overlook his forfeiture under our state high court's decision in *People v. Anderson* (2020) 9 Cal.5th 946. We decline to do so because the three reasons cited by the high court in *Anderson* do not apply here.

First, the alleged error in permitting the amendment of the informations is not "clear and obvious," as was the violation of the "express pleading requirements" contained in the relevant statutes in *Anderson*. (*People v. Anderson*, *supra*, 9 Cal.5th at p. 963.) Here, Rogers argues that, after the enactment of Senate Bill No. 567, a conduct-based aggravating factor qualifies as an "offense" within the meaning of section 1009 that cannot be added to an accusatory pleading after the waiver of preliminary hearing. As Rogers acknowledges, at least one court has rejected this argument. (*Chavez Zepeda v. Superior Court* (2023) 97 Cal.App.5th 65, 71, 92-97 [no statutory requirement to prove aggravating circumstances at preliminary hearing].) Rogers contends that *Chavez Zepeda* was wrongly decided, but even if he were correct, that would not make the claimed error clear and obvious.

Second, the alleged error here did not affect Rogers's "substantial rights by depriving [him] of timely notice of the potential sentence he faced." (*People v. Anderson*, *supra*, 9 Cal.5th at p. 963.) As an initial matter, in early 2021 when Rogers waived his right to a preliminary hearing in both cases and the felony complaints were deemed informations, Senate Bill No. 567 had not yet taken effect, meaning that the Legislature had not made the middle term the presumptive term absent further findings of aggravating or mitigating facts. Instead, former section 1170, subdivision (b) stated: "When a judgment of imprisonment is to be imposed and the statute specifies three possible terms, the choice of the appropriate term shall rest within the sound discretion of the court." (Former § 1170, subd. (b); Stats. 2015, ch. 378, § 2.) Thus, when Rogers

29

waived preliminary hearing, an upper term sentence was within the range of sentences that could be imposed. Moreover, the People did in fact plead each of the disputed aggravating factors before trial began, providing Rogers with notice and the opportunity to contest those factors both before and during sentencing. He opted to do neither. (Cf. *Anderson*, at p. 963 [prosecution's intent to seek firearm enhancements, which "were never pleaded," was not clear until day of sentencing hearing].)

Nor does the alleged error here "go[] to the overall fairness of the proceeding." (*People v. Anderson*, *supra*, 9 Cal.5th at p. 963.) Rogers was aware at the outset that he might face an upper term sentence, and when the sentencing law changed mid-prosecution, he received clear notice of the alleged aggravating factors before trial and acquiesced in the amendment of the charging documents. We see no fundamental unfairness that would warrant excusing the forfeiture in this case.

DISPOSITION

The judgment is affirmed.


/s/
FEINBERG, J.

We concur:


/s/
HULL, Acting P. J.


/s/
BOULWARE EURIE, J.